

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
11/19/2010

| | | |
|---|---|---|
| IN RE: | § | |
| MARVIN E. MOYE; dba JMW AUTO | § | CASE NO: 07-37770 |
| SALES, LTD; dba JMW AUTO SALES, LLC; | § | |
| dba JMW GROUP INVESTMENTS, LTD.; | § | |
| dba JMW AUTO TRANSPORT, LLC; dba | § | |
| JMW AUTO SALES; dba JMW RETAIL | § | |
| AUTO SALES, LTD., *et al* | § | |
|     Debtor(s) | § | |
| | § | CHAPTER  7 |
| | § | |
| LOWELL T CAGE | § | |
|     Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 08-3203 |
| | § | |
| LUIS GARCIA | § | |
|     Defendant(s) | § | |

## MEMORADUM OPINION
## CONCERNING SUMMARY JUDGMENT

    In four separate adversary proceedings, the chapter 7 Trustee seeks to recover transfers made by the Debtor during the "preference period", *i.e.* within 90 days prior to the filing of the bankruptcy petitions that commenced these bankruptcy cases.  The Defendants do not dispute that the transfers were made and do not dispute that the transfers were made within 90 days prior to the filing of the bankruptcy petitions.  Defendants contend (i) that they were not creditors of the bankruptcy Debtors and (ii) that the money transferred to them was not Debtors' property; Defendants argue that the transfers were proceeds of the sale of notes (Retail Installment Contracts) that Defendants owned and delivered to Debtors for sale to third parties.  From the summary judgment evidence and authorities provided by the parties, the Court concludes, as a matter of law, that Defendants never became owners of the Retail Installment Contracts and therefore were always Debtors' creditors.  The pre-bankruptcy payments allowed Defendants to receive a greater return on their claims than other creditors similarly situated, and therefore the pre-bankruptcy payments are preferences that the Trustee is entitled to recover under Bankruptcy Code § 547.  This memorandum will be entered in each adversary proceeding with a separate judgment in each adversary proceeding.

## FACTS

    The documentation attached to the motions for summary judgment establish the following facts, most of which are undisputed:

Debtors were in the retail used car business. In 2003, Mrs. Moye, (one of the Debtors) obtained a Texas Motor Vehicle Sales Finance License so that Debtors could finance the sales in-house. To evidence the loan to purchase a vehicle, customers signed a Retail Installment Sales Contract ("Installment Contract") that was secured by the used car. "JMW Auto Sales" was listed as the lienholder.[1]

To realize the value of these contracts more quickly as the business grew, Debtors purported to sell Installment Contracts to investors, who were referred to as "Pool Investors." The only documentation for this practice was that both Debtors and the Pool Investors signed a Master Purchase and Sale Agreement ("Master Agreement") the form of which is attached to Defendants' motion for summary judgment as Exhibit 7.

After signing a Master Agreement, when Debtors and a Pool Investor agreed on an amount to be "invested," Debtors would assemble ("pool") a number of Installment Contracts with an aggregate current principal balance equal to the amount of the agreed investment. Sometimes Debtors kept the original Installment Contract documents and sometimes Debtors delivered originals to the Pool Investors; Debtors did not endorse any Installment Contract to Pool Investors, nor did Debtors execute any separate document that transferred rights in any specific Installment Contract to the Pool Investor(s). Debtors did not modify the vehicle title to note the Pool Investor as the holder of the security interest in the vehicle. JMW Auto Sales continued to be listed as the lien holder on the certificate of title.[2] In some cases Debtors maintained possession of the vehicle titles and in some cases Debtors delivered the vehicle titles to the Pool Investors.

The Master Agreement is a "concept" document; it does not specifically list any Installment Contracts. It purports to define ongoing relationships with respect to any Installment Contracts that a Pool Investor might purchase from time to time. The Master Agreement contemplates the execution of schedules that will specify with particularity any Installment Contracts that will be transferred under the Master Agreement and will identity of the transferee. But no schedules were ever executed.[3]

The vehicle purchasers were never notified of any assignment of their contracts. The Pool Investors did not file UCC-1's to perfect a security interest in the Installment Contracts or in any stream of payments due under the Installment Contracts.

Even after the alleged transfer of an Installment Contract to a Pool Investor, Debtors continued to service the note, collecting payments and repossessing vehicles in cases of default. Although the Master Agreement contemplated execution of a servicing agreement to govern the details of Debtors' collection activities, no such servicing agreement was ever executed.[4] Debtor had no authority to charge fees for collection work and in fact did not charge any such fees.

---

[1] Affidavit of Lowell Cage attached to Trustee's Motion for Summary Judgment ("Cage Affidavit").
[2] Cage Affidavit.
[3] None were provided as summary judgment evidence.
[4] Defendants attached their affidavits to their motions for summary judgment and to their responses to Trustee's motion for summary judgments ("Pool Participants Affidavits"). In those affidavits, Defendants allege that they "entered into a servicing agreement." The affidavit does not state that a servicing agreement was "signed" or otherwise documented. The affidavits do not give any specifics of the alleged agreement except to say that

The financial risk of default on an Installment Contract did not transfer to the Pool Investor.  If the vehicle purchaser defaulted, the Master Agreement called for Debtor to substitute another Installment Contract for the defaulted contract.

In fact, the details of collection (as related to specific Installment Contracts) were ignored.  Debtor simply paid to the Pool Investors the <u>scheduled</u> collections, regardless of the amount actually collected.  Debtors used other funds to pay Pool Investors when collections on the original "bundle" of Installment Contracts were inadequate.

In some cases Installment Contracts were paid off early, most commonly when the vehicle had been in an accident and insurance proceeds paid the note.  In those situations, Debtor did not "pass through" the early payment to the applicable Pool Investor; Debtors but would use the prepayment for Debtors' other purposes.[5]

Funds received from pool participants, retail vehicle purchasers, and floor plan lenders were deposited and commingled without distinction in Debtors' operating accounts with Debtors' other funds.[6]

TEX. FIN. CODE § 348.501(a) requires "holders" of vehicle retail installment contracts to be licensed.  Prior to the filing of these bankruptcy cases, the Pool Participants involved in these adversary proceedings were not licensed.[7]

In 2007 Debtors were unable to continue to fund payments to its Pool Investors.  The largest Pool Investor (MRB)[8] confronted Debtors and demanded enforcement of what MRB perceived to be its rights to the Installment Contracts.  Debtors, MRB and other Pool Investors agreed to cooperate to sell the Installment Contracts to a third party.

Debtors solicited offers for purchase of the Installment Contracts at discounted value.  Mid-Atlantic Finance Co. Inc. agreed to purchase the Installment Contracts at 83 cents on the

---

Debtors were to collect amounts due on retail installment contracts and were to forward the collections to the Pool Participants.  Defendants did not attach a copy of any documentation.  The Court therefore concludes that there was no written documentation for the servicing agreement.

[5] *Id.*  "Debtors would without the customer's knowledge and contrary to the intent if not the specific terms of [the Master Agreement] … customarily not apply the re-sale proceeds or the insurance proceeds to the participant's pool balance but rather would use the monies for some other purpose.  Notwithstanding the Debtors' receipt of an accelerated payment on an Installment Contract and the disposal of the 'pooled' vehicle, the Debtors would still continue to pay the scheduled monthly payment due to Strange and other pool participants although no future monthly payments would be received from the customer by the Debtors."

[6] Cage Affidavit, paragraph 15.

[7] Mr. Waite's Affidavit, one of the The Pool Participants' Affidavits, states that he obtained a license, but he does not give the date, or even an approximate date.  The fairest reading of the affidavit is that the license was obtained after the bankruptcy petition was filed.  The legal rights of the parties are determined as of the date of the filing of the bankruptcy petition.

[8] The Trustee has settled with MRB and that pool participant is not involved in these adversary proceedings.

dollar. The contracts between Debtors and Mid-Atlantic were made in Debtors' name, with no disclosure of agency or representative status.[9]

The Pool Investors who had possession of Installment Contracts delivered them to Debtors who sold all Installment Contracts (including Investment Contracts that had not been delivered to Pool Investors) to Mid-Atlantic for $1.927 million. Debtors remitted some of the funds to the Defendants. Defendants admit receipt of the funds. Defendants contend that they owned the Installment Contracts and that Debtors acted as Defendants' agents for the sale of the Installment Contracts. Therefore, Defendants argue, the funds that Debtors transferred to Defendants were not property of the bankruptcy estate and cannot be recovered as preferential transfers or as fraudulent transfers.[10]

On October 31, 2007, an involuntary bankruptcy petition was filed against JMW Auto Sales, case # 07-37364. An order for relief was entered in due course. About a week later, Marvin and Joan Moye filed a voluntary petition commencing case # 07-37770. The cases have been jointly administered.

The payments to the Pool Investors were made less than 90 days before the bankruptcy petitions were filed. Bankruptcy Code § 547(f) establishes a presumption that the estate was insolvent in the 90 days preceding bankruptcy.[11] Trustee Cage's affidavit establishes that the transfers (if not avoided) would enable the Defendants to receive more than they would receive in a chapter 7 liquidation. The affidavit of Harold May establishes that Debtors were insolvent in the 90 days prior to bankruptcy. Defendants provided an affidavit of Debtor Marvin Moye relating to solvency. That affidavit is inadequate to establish a material fact for trial for the reasons set forth below in more detail below.

## DEFENDANTS' SUMMARY JUDGMENT EVIDENCE

Defendants' summary judgment evidence consists of Defendants' affidavits, Marvin Moye's (*i.e.* Debtor's) affidavit, Defendants' attorney's affidavit, and an exemplar of the Master Agreement,

A.      Defendants' Affidavits—the Pool Investors' Affidavits

The thrust of Pool Participants' Affidavits relates to what they believed to be their legal relationship with Debtors and their rights under the law:

> 1.      Defendants state that they thought that they owned the Retail Installment Agreements because the Master Agreement stated that it was an agreement for purchase and sale and stated that the transaction was not a loan. While the Master Agreement does in fact so state, neither the bald statement in the document nor Defendants' affidavits are determinative of the legal classification of the

---

[9] Cage Affidavit, paragraph 22.
[10] The chapter 7 Trustee also filed suit againt MRB and other Pool Investors who are not Defendants. Those claims have been settled without trial.
[11] *See also* affidavit of Harold May attached to the Trustee's motion for summary judgment.

transaction. More important, the Master Agreement is clearly not a document evidencing a "present sale." The very statement quoted in the affidavits is illustrative. The document states: "One (sic) the closing date, Seller <u>shall sell</u> …" The agreement clearly contemplates a future, hypothetical sale, not a present sale of identified property. The affidavit does not define a closing date or even indicate that a closing date ever occurred; the affidavit provides no evidence that any specific contracts were ever identified for transfer. The document does not define the consideration for the sale. Therefore, while the affidavits indicate that the parties intended to sell, it does not indicate that a sale ever took place.

2. Defendant Waite's affidavit states that he consulted with counsel who carefully studied the agreement and advised affiants that "it was a good solid contract" and there was "nothing wrong with it." That allegation is not considered, first because it is hearsay and second because (even assuming the allegation to be correct) Defendant's counsel's view of the law is not controlling.[12]

3. Defendant Waite's affidavit also states that he obtained a license from the State of Texas to legitimize his ownership of the Retail Installment Contracts, but he does not state <u>when</u> he did so. The fairest reading of the affidavit, in context, is that he obtained the license after the bankruptcy case was filed. Mr. Waite did not attach a copy of the license. The allegation is not relevant because the legal relationship of the parties was determined when the payments were made; those payments were made when the contracts were sold to Mid-Atlantic, prior to bankruptcy, not later when Mr. Waite obtained a license. Mr. Waite's affidavit also states that he called the OCCC and asked whether he needed a license, and was told that he did not. This allegation is not competent because it is hearsay and is irrelevant for reasons discussed above.

4. The affidavits assert that Debtors had no interest in the money transferred to them because the money so transferred was proceeds of the sale of Retail Installment Contracts that Defendants owned. The statements are legal conclusions and therefore inadmissible. Defendants provided no evidence of an agency agreement and provided no evidence contradicting the Trustee's summary judgment evidence that the contract for sale of the Retail Installment Contracts was a contract between Debtors and Mid-Atlantic, with no evidence of Debtor acting in an agency or other representative capacity.

B. Marvin Moye Affidavit

Mr. Moye is a Debtor; he is the person who operated the used car business.[13] His affidavit does not indicate that there is a material issue of fact for trial:

---

[12] The language of the individual affidavits varies slightly with respect to the attorney's comments, but the allegations must be disregarded for the same reasons. In addition, Defendants Shirley Strange and Luis Garcia do not allege that they contacted an attorney.

[13] Mr. Moye's commitment to his duties as a debtor and to the truth has not been what it should be in this case. In Adversary Proceeding # 08-3119, docket # 51, the Court wrote: "In Adversary Proceeding 08-3288, the

1. He asserts that he is familiar with industry standards. That is irrelevant.

2. He asserts that Debtors engaged a competent accountant who provided an income statement and balance sheet for the six months ended June 30, 2007. The statement is hearsay. More important, the balance sheet and income statement are irrelevant because the period relevant to the Trustee's claims is August to October, 2007.[14] The accountant's June 30 financial statements do not rebut the statutory presumption sufficient to create an issue of fact for trial.

3. Mr. Moye substantially corroborates the Trustee's allegations that Debtors commingled funds of all kinds. The affidavit asserts that Debtors kept bookkeeping records that identified separate rights of the Pooled Investors. The affidavit gives no detail about the bookkeeping records. It does not contradict the Trustee's allegations that Debtors treated the Pooled Investors rights as a "virtual" collection; *i.e.* that Debtors calculated the amount due the Pooled Investors each month and paid them that amount (so long as Debtors were able) but without regard to the source of the funds for the payment, whether from other investor funds, Debtors' general operating income, *etc.*

4. Mr. Moye corroborates that the funds that the Trustee seeks to recover were paid by Mid-Atlantic but were not segregated except on Debtors' books. That does not create a material issue of fact for trial, because the Court concludes (below) that the Retail Installment Contracts did not belong to the Pool Investors, and therefore the money paid to Debtors, regardless of how they were divided on Debtors' books, was Debtors' property.

C. Defendants' Attorney's Affidavit

The Court strikes this affidavit. First, the affidavit is principally statements of counsel's conclusions of law. The appropriate place for argument of the law is a memorandum of authorities. To the extent that the affidavit contains fact issues, the affidavit violates ethical rules which prohibit an attorney from being a witness in a case, except on very limited matters.[15]

---

Court found that Debtor transferred property of the estate with the intent to hinder, delay, or defraud the trustee and creditors. *See*, Adversary Proceeding 08-3288, docket # 34. And in connection with the trial of that matter, the Court found that Debtor had made a false statement and oath in connection with the case." For purposes of this motion to summary judgment, the Court assumes that Mr. Moye's statements in this affidavit are true.

[14] The bankruptcy petition dates were October 31, 2007, to November 6, 2007.

[15] The Texas Disciplinary Rules of Professional Conduct prohibit attorneys from appearing both as a witness and as counsel in the same proceeding. TEX. DISCIPLINARY R. PROF'L. CONDUCT 3.08 (2010). The primary objective for the advocate-witness rule is the protection of the fact-finding process. "[The] adversary system works best when the roles of the judge, attorneys, and of the witnesses are clearly defined. Any mixing of those roles inevitably diminishes the effectiveness of the entire system." Robert P. Schuwerk & John F. Sutton, Jr., A GUIDE TO THE TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT § 3.08(1990), *citing Cottonwood Estates v. Paradise Builders*, 128 Ariz. 99, 102, 624 P.2d 296, 300 (1981). The rule may not be waived by the client: "Because this rationale for the prohibition is based on protecting the truth seeking process, it follows that client consent to the lawyer's dual role should not negate its impropriety." *Id*.

D. The Master Agreement

The agreement is merely an exemplar. It evidences that transfers of the Installment Contracts was something that would not happen (if it was ever consummated) until there was further documentation. It substantiates the Trustee's summary judgment evidence and provides nothing additional.

E. Conclusion

Defendant's summary judgment evidence provides no material issue of fact for trial.

## CONCLUSIONS OF LAW

Defendants were defrauded. But Defendants were not the only ones whom Debtors defrauded. Debtors defrauded floorplan lenders, other pool investors, and retail vehicle purchasers. The harm done to retail purchasers is especially egregious. The retail vehicle purchasers were poor individuals who attempted to purchase a used car, only to be caught in fights between floorplan lenders and pool investors. Those fights kept many of those retail purchasers from getting titles to their cars timely. Being trampled in the fight among Debtors' floor planners and pool lenders, some retail purchasers simply abandoned the transaction after making numerous car note payments.[16]

There are simply not enough assets to reimburse everyone who was defrauded. In those circumstances, bankruptcy law authorizes the chapter 7 Trustee to recover payments made to some creditors in the 90 days prior to the bankruptcy petition if failure to recover the payments would allow those creditors to recover more than creditors with equal rights under the law. This analysis is not about what Defendants "thought" they bought or about whether Debtor defrauded them. It is about how the law defines the parties' legal rights and obligations.

A   Defendants Did Not Own The Retail Installment Contracts

The Master Agreement evidences an agreement to purchase in the future. It does not evidence a consummated transfer of the benefits and burdens of ownership.

    1. There is no evidence of the transfer of any specific Retail Installment Contract

This point does not require extended explanation. Defendants have not provided any summary judgment evidence whatsoever evidencing the transfer of specific Installment Contracts. All they have provided is a generic Master Agreement for the transfer of contracts in the future. Even assuming that Debtors maintained books showing different accounts, those books were obviously bogus because payments to Defendants did not relate to actual collections and investment experience but was "virtual" payout.

---

[16] The Court has held countless hearings, involving the Trustee and these Defendants, trying to straighten out the paperwork nightmare.

>  2. Transfer of the Contract Would Violate Texas Law—a contract for an illegal act is unenforceable

TEX. FIN. CODE § 348.501(a) requires "holders" of vehicle retail installment contracts to be licensed. It is undisputed that prior to the filing of these bankruptcy cases, Defendants were not licensed. While Mr. Waite alleges that he obtained a license at some point subsequent to the filing of the bankruptcy cases, it is undisputed that none of the other Defendants ever had proper legal authority to own the Installment Contracts.

The Trustee argues that because Defendants could not legally own the Installment Contracts, even if there were a contract intending to transfer ownership to Defendants, the contract was void. Defendants argue that there is no private right of action under the contract.

The Court agrees with the Trustee. The Trustee is not seeking enforcement of the statute. The Trustee is defending against a claim of ownership of Installment Contracts by arguing that any contract for sale of the Installment Contracts would is void under Texas law.

A contract to do a thing which cannot be performed without violation of the law violates public policy and is void. *See Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 148-49 (1947); *Jack v. State,* 694 S.W.2d 391, 397 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.). The purpose behind this rule is not to protect or punish either party to the contract, but to benefit and protect the public. *Lewis,* 199 S.W.2d at 151; *In re Kasschau,* 11 S.W.3d 305, 312 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding).

There is an exception to this rule that protects parties who do not know that the contract is illegal. *See Graham v. Dean,* 144 Tex. 61, 188 S.W.2d 372, 373 (1945); *Int'l Bank of Commerce-Brownsville v. Int'l Energy Dev. Corp.,* 981 S.W.2d 38, 52 (Tex.App.-Corpus Christi 1998, pet. denied). And Defendants in these adversary proceedings assert that they did not know, and did not believe, that the law required them to be licensed in order to be assignees (holders) of the Installment Contracts. However, the exception is not applicable to Defendants because it only applies when there is a mistake of fact, not a mistake of law:

> It is true there are cases which hold when the parties to an illegal contract are not *in pari delicto,* the party least culpable may recover. *See American Nat'l Ins. Co. v. Tabor,* 111 Tex. 155, 230 S.W. 397, 400 (1921); *Futch v. Sanger,* 163 S.W. 597, 598-99 (Tex.Civ.App.-Austin 1914, writ ref'd). However, such cases depend upon the knowledge of peculiar facts by the defendant, not known by the party seeking to enforce the contract, in other words, a mistake of fact. This case does not involve any mistake of fact. Both parties were aware of the facts surrounding the entering of their contract. It is simply irrelevant that Plumlee maintains ignorance that this type of contract was illegal. *See Cherokee Water Co.,* 727 S.W.2d at 615 ("ignorance of the law is no excuse").

*Plumlee v. Paddock* 832 S.W.2d 757, 759.

But even if ignorance of the law were an excuse, as noted above, there is simply no document translative of rights, no actual sale, of the Installment Contracts.[17]

3. While Nominally a Sale, the Relationship of the Parties Was Lender and Borrower

Debtors defrauded Defendants, and Defendants therefore had a claim against Debtors prior to the filing of the bankruptcy cases.

4. Defendants Never Perfected Any Security Interest

It is undisputed that Defendants never documented nor perfected any security interest.

5. The Amounts Transferred

Plaintiff has submitted summary judgment evidence establishing the following transfers.

| Adv. # | Defendant | Amount |
|---|---|---|
| 08-3124 | Warren Waite Jr, | $391,948.22 |
| | Warren Waite III | $16,555.71 |
| 08-3202 | FT Development, Inc. | $31,363.49 |
| 08-3203 | Luis Garcia | $106,116.06 |
| 08-3223 | Robert and Shirley Strange | $34,113.00 |

Defendants have provided no summary judgment evidence disputing the dates and amounts of the transfers.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings.[18]

---

[17] Texas Courts are more liberal in applying the "illegal contract" doctrine to cases involving a statutory licensing requirement. *See Denson v. Dallas County Credit Union,* 262 S.W.3d 846, 854 - 855 (Tex. App.--Dallas 2008, no pet.)(holding that "in situations where public policy concerns have led to a governmentally supervised statutory licensing scheme, courts have consistently held the unlawful and unlicensed participation in such regulated businesses cannot form the basis for recovery…To hold otherwise would allow a person to accomplish indirectly what he is prohibited from doing directly and frustrate the public policies behind the legal protections." The *Denson* Court notably opined: "We recognize there is nothing inherently illegal about selling cars in Dallas County; however, under these facts, the transaction of selling the cars was illegal because on the day of the transactions, appellants did not have the required statutory license.")

[18] Rule 56 was amended, effective December 1, 2007. Although most changes were stylistic, the changes to Rule 56(c) were substantive. Prior to the amendment, Rule 56(c) provided that the Court "shall" grant summary judgment if the relevant criteria were met. Effective December 1, 2007, the word "shall" was changed to "should".

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) ("A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party."); *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008). A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F. 393, 405 (5th Cir. 2003). The Court should not weigh the evidence inasmuch as a credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Sossamon*, 560 F.3d at 326; *U.S. v. 92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The non-moving party has a duty to respond with specific evidence demonstrating a disputed fact issue. *Celotex Corp. Cattrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *92,203.00 in United States Currency*, 537 F.3d at 507. When identifying specific evidence in the record, the non-movant must "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004); *Raga v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant does not bear the burden of proof, the movant must show the absence of sufficient evidence to support an essential element of the opposing party's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412; *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). Movants who do not bear the ultimate burden of proof often seek summary judgment after discovery has produced insufficient evidence to support the non-moving party's claims. Upon an

---

The Committee Notes to the 2007 amendment state that the word "[s]hould" was substituted for "shall" to recognize that, "although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56 advisory committee's notes (2007). As one commentator noted, "even when a motion for summary judgment is properly made and supported, it need not be granted . . . [s]uch a motion may be granted - indeed, it should be granted - but it does not have to be granted." Bradley S. Shannon, *Should Summary Judgment Be Granted?*, 58 Am. U. L. Rev. 85, 95 (2008).

adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue" rather than relying on conclusory allegations. *Adams v. Travelrs Indem. Co.*, 465 F.3d 156, 163–64 (5th Cir. 2006); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Ultimately, the motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## COUNTERCLAIMS

In each of the adversary proceedings, Defendants filed a counterclaim for the following relief:

1. A declaratory judgment that the Installment Contracts were not property of the estate, immediate release of all monies held by Cage and derived from the Installment Contracts, and

2. Damages against Plaintiff for incompetent and wrongful prosecution of this bankruptcy case.

The analysis in this memorandum and the ruling in favor of Plaintiff resolves, against Defendants, the issues on which the first claim is made.

The claim for damages for incompetent and wrongful prosecution of this bankruptcy case fails to state a claim on which relief can be granted. The Trustee's actions in this case have been taken by filing motions for authority and only after approval by the Court. The Court's ruling on those issues is now *res judicata,* or at a minimum the Trustee's actions are based on orders that are the law of the case. Counsel for these parties have complained for almost 3 years that the Trustee has overstepped his authority by continuing the business and by a number of other actions for which the Trustee sought, and received, Court authority. The Court has told counsel that if he believes that the Trustee was not performing his duties properly, counsel should have filed a motion to remove the Trustee. [19] Counsel has taken no action to raise the issue properly in the bankruptcy case. In addition, Defendants have not attached to their motion for summary judgment any summary judgment evidence on this claim and have not argued it in their memorandum. The Court treats the claim as abandoned.

## CONCLUSION

With respect to the Plaintiff's claims, Plaintiff has provided summary judgment evidence on all points related to recovery of the preferences. Defendant has not provided summary judgment evidence of a material issue of fact for trial.

---

[19] Case Number 07-37770, *Document* # 213, Memorandum Findings, Conclusions, and Reasons for Order Granting Motion to Extend Operation of Business.

With respect to Defendant's counterclaims, the issues have been decided adversely to Defendant in prior proceedings or in the ruling on Plaintiff's claims in this memorandum.

Therefore, by separate judgment entered in each adversary proceeding, final summary judgment is awarded in favor of Plaintiff.

SIGNED 11/18/2010.

_____
Wesley W. Steen
United States Bankruptcy Judge